[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings:
1. The Department of Children Youth Services ("DCYS") seeks to terminate the parental rights of Sandra S., mother, and Mark M., the putative father, in their minor CT Page 6428 child, Christopher S., born on October 16, 1984.
2. On April 4, 1988, the child was adjudged neglected or uncared for and committed to DCYS for eighteen months in accordance with section 46b-129 (d) of the Connecticut General Statutes.
3. The petition for termination was filed on March 21, 1990, and amended on April 30, 1991. This petition was filed pursuant to section 17a-112 (formerly 17-43a) of the Connecticut General Statutes (Rev. 1991) applicable to children previously committed to DCYS in accordance with section 46b-129 (d).
The petition alleged four grounds: (1) abandonment; (2) failure to achieve personal rehabilitation; (3) denial by acts of parental commission or omission, the care, guidance or control necessary for the physical educational moral or emotional well-being of the children; and, (4) lack of an ongoing parent/child relationship, all of which have existed for at least one year. Section 17a-112 (b)(1), (2), (3) of the Connecticut General Statutes.
On April 16, 1990, the mother, through court appointed counsel, denied the allegations. The putative father, Mark M., has never acknowledged paternity, was served but never appeared, therefore, he was defaulted.
A trial was held before Judge Mottolese on May 14, 1990, July 23, 1990, August 13, 1990 and November 13, 1990, but he declared a mistrial because of his reassignment to another Judicial District.
The case was continued for a retrial, which was held on April 29, 1991 and April 30, 1991, and ended on May 13, 1991. At this trial, the following persons testified for the petitioner: DCYS social workers, Aneta Markham, Lorraine Aurio, and Claire Sansone: Barbara Miller, child therapist with the Waterbury Mental Health Clinic; Mary Burke and Linda Patterson, foster parents for the child; Dr. Mark Simms, a pediatrician who filed two developmental pediatric evaluations on the mother; Dr. Fernando Stern, a psychiatrist and consultant at Niantic Correctional Center; Emmanuel Gotterdiener, a psychiatric social worker at Niantic Correctional Center.
The respondent mother did not testify nor did she call any witnesses on her behalf.
The standard of proof in an action to terminate CT Page 6429 parental rights is clear and convincing evidence, or as sometime stated, clear and positive proof. Section17a-112 (b) of Connecticut General Statutes. In re Juvenile Appeal (84-BC), 194 Conn. 252, 255; In re Theresa S.,196 Conn. 18, 24 n. 5; In re Juvenile Appeal (83-BC), 189 Conn. 66,72; In re Juvenile Appeal (84-6), 2 Conn. App. 705,708, cert. denied, 195 Conn. 801. See also Santosky v. Kramer, 455 U.S. 745, 747-48. Clear and convincing evidence has been described as a level of proof that lies between the usual civil requirement of a fair preponderance of the evidence and the criminal standard of beyond a reasonable doubt. Cookson v. Cookson, 201 Conn. 229, 234. Proof by clear and convincing evidence means proof of a quality that is sufficient to convince the court beyond an average certainty that the respondent's rights as a parent should be ended. In re Juvenile Appeal (84-3), 1 Conn. App. 463,468. The petitioner is required to prove only one of the grounds alleged by clear and convincing evidence in order to prevail on the petition. In re Juvenile Appeal (84-3), supra, 463, cert. denied, 193 Conn. 802.
A petition for the termination of parental rights consists of two phases, the adjudicatory phase and the dispositional phase. Connecticut Practice Book, Sec. 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings; rather, a unified hearing is permissible. In re Juvenile Appeal, 192 Conn. 254, 259 (1984). There is a different purpose for each of the two phases. In the adjudicatory phase, the Court receives evidence to determine the validity of the allegations made in the petition, and the Court is limited in receiving evidence to the events that occurred prior to the filing of the petition. The dispositional phase takes into account the best interest of the child, and the Court is permitted to take into consideration events which had occurred after the filing of the petition to the time of trial.
FACTS: Some background facts are not in dispute. The child, Christopher S., was born at Danbury Hospital on October 16, 1984. Two days later, Dr. Kirby D. Rekedal, the doctor responsible for their care, filed a report of suspected abuse with DCYS alleging that her bizarre behavior at the hospital, and past psychiatric history, made her incapable of caring for this infant. On October 19, 1984, Christopher was placed in foster care where he remained until July 8, 1985, or about eight months. During this time, DCYS provided the mother, Sandra S., with a number of services, such as a parent aide, drug treatment, and counseling at the Danbury Mental Health Clinic to help rehabilitate her life. CT Page 6430 With medication and treatment, she was able to control her mental illness diagnosed as chronic schizophrenia. Her behavior improved enough so that in July, 1985, her son was returned to her and they lived together for the next two years.
But beginning in January of 1987, her behavior began to deteriorate. During the next thirteen months, DCYS received at least ten referrals or complaints from neighbors, the Danbury Mental Health Clinic, and the Danbury Police Department that she was abusing Christopher. On February 12, 1988, she was arrested for possession of narcotics and risk of injury to her son, and committed to jail at Niantic.
On April 4, 1988, the child was adjudicated neglected and committed to DCYS for eighteen months. Christopher has remained in foster care to the present time, approximately, thirty-eight months.
ADJUDICATORY PHASE: The Court will consider the facts and evidence from October 22, 1984, to the date of the amended petition, April 30, 1991.
The second ground alleged in the termination petition is that since the adjudication of neglect, Sandra S. has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and the needs of the child, . . . [she] could assume a responsible position in the life of the child." Connecticut General Statutes, Sec. 17a-112 (b)(2).
The term "`[p]ersonal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, cert. denied, 199 Conn. 809
(1986); In re Rayna M., 13 Conn. App. 23, 32 (1987); In re Davon M., 16 Conn. App. 693, 695 (1988).
The primary question is whether this mother was able to reform her behavior and life style during these past thirty-eight months. What is a reasonable time for rehabilitation within the meaning of the statute is a question or fact for the Court to decide. In re Davon M., supra, 695. Rehabilitation concerns acts of conduct as what a parent in fact did to reform and meet the child's daily needs.
After Sandra S. was released from jail on April 18, 1988, her social worker, Lorraine Aurio, testified that three treatment plans were prepared to help her reform. (State's CT Page 6431 Exhibits H, 4, 5 and 6.) She was required to comply with conditions of probation for the next three years, one of which included drug counseling and treatment and taking medication for her mental illness. These treatment plans all required her to keep DCYS informed of her address, submit to psychological evaluation, and to cooperate with DCYS. During the first four months, she contacted DCYS twice, she failed to submit to the psychological evaluation, refused to structure visitation with her child, and refused to give her place of residence because "it was none of their business." She did make two unscheduled visits with Christopher with DCYS present, but after the second visit the child was violent and out of control. Ms. Aurio had the child evaluated and examined by Mark D. Simms, M.S., a pediatric consultant whose report is State's Exhibit J. He recommended that the mother should not be allowed any visitation because the child's emotional health would be jeopardized and he had already been significantly damaged emotionally by his mother's years of neglect.
Between September, 1988 to January, 1989, the respondent was at different locations and her whereabouts were unknown to DCYS. She failed to make four court appearances on her motion for visitation and other proceedings. She failed to submit to the court ordered psychological evaluation. She failed to take medication for her drug habit. On May 5, 1989, she tested positive to using cocaine in violation of her probation, whereby she returned to jail in Niantic to serve her one year sentence. In fact, she was in jail at Niantic from May 10, 1989 to July 5, 1989; from February 8, 1990 to April 20, 1990; and, from September 22, 1990 to April 16, 1991 for her continued drug use and for violation of the probation. (See State's Exhibit A.)
In July, 1989, another DCYS caseworker, Claire Sansome, replaced Ms. Aurio as the caseworker. She was finally able to have Robert S. Colen, Ph.D., do a psychological evaluation on Sandra S. on May 12, 1990. He testified that she admitted using drugs as the reason she gave for having lost custody of her son. In his report of May 12, 1990 (State's Exhibit H), Dr. Colen states as follows: "It appears that she has not attempted to maintain a relationship with her son for the past two years and has not demonstrated any significant moves toward rehabilitation . . . that her prognosis does not look good for the future. She seems to be struggling herself to meet the demands of daily living in coping with her drug problem and psychiatric condition."
Both Dr. Simms and Dr. Colen testified at trial that CT Page 6432 she was not able to reform her drug use or control her mental illness to do what is required to parent a child. The expert testimony of psychologists is entitled to great weight in termination proceedings. In re Nicolina T., 9 Conn. App. 598,605 (1987).
Dr. Fernando Stern, a licensed psychiatrist and consultant at the jail in Niantic, testified that he supervised and treated her as an inpatient at the mental health unit at this jail from January 29, to April 23, 1991. During this time, she was experiencing hallucinations, memory impairment and bizarre behavior. His diagnosis is that she has a chronic schizophrenic disorder and loses contact with reality and is often confused as to time, place and persons. He prescribed both oral and injectable prolixin to calm her anxieties. His prognosis for recovery was guarded.
Emmanuel Gotterdiener, her psychiatric social worker at Niantic, testified that from January to April 1991 she could not follow rules at the prison. He said it would be difficult for her to function without medication and therapy and would need supervision when released from prison.
Dr. Colen stated that she is marginally functional and has not demonstrated any significant moves toward rehabilitation. She does not have a suitable home to raise her son. His report of May 12, 1990, confirmed by his testimony at trial, stated that she would not be capable to adequately parent this six year old child. (State's Exhibit 11.)
Barbara Miller, a child therapist at Waterbury Mental Health Clinic with eighteen years experience, testified that this child needs a safe and permanent home now. Christopher has not seen his mother for over twenty-eight months and does not want to see her now. There is no bond between them nor positive feelings towards her. Since he is now over six years old and has been in four foster homes during these past three years, he should be adopted as soon as possible. In her opinion, he needs a sure thing now.
The mother did not testify to contradict any of this testimony, nor were any witnesses called for her.
In his brief, the attorney for the mother urged the Court to give her one last chance to rehabilitate herself and allow visitation rights which had been suspended by court order on January 23, 1989. From the uncontraverted testimony of the clinical experts, the evidence is overwhelming, more than the required standard of clear and convincing, that to CT Page 6433 allow visitation now would not be in the best interest of this child. This conclusion was confirmed by the testimony of his present therapist, Barbara Miller, who has been seeing Christopher S. on a weekly basis for the past two and one-half years.
The attorney for the child believes that Christopher should be allowed the opportunity to develop his life in a loving and permanent home. The Court recognizes that Sandra I has had a sad and troubled life because of her mental illness and past history of drug use. While the Court may feel compassion for her, the evidence is clear and convincing that she was given at least three opportunities and a variety of services to control her drug use. A parent aide was provided to help her learn parenting skills. She herself chose to live a nomadic life style and continued to use heroin, alcohol and other drugs. She refused to comply with all treatment plans prepared by DCYS. Based on the testimony of all clinical experts, the three DCYS social workers, the mandated social study and other reports on file, the Court finds that the petitioner DCYS has proven the second ground in the petition, her failure to rehabilitate, by clear and convincing evidence as required by Connecticut General Statutes, Sec. 17a-112 (b)(2). In fact, the Court finds the evidence was more than this required standard of proof and uncontraverted by the respondent.
A second ground for termination alleged by DCYS is that the child has been denied by an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Connecticut General Statutes, Sec. 17-112 (b)(4). The petitioner relied to a large degree on the facts proven on the prior finding of failure to rehabilitate. The same evidence may form the foundation for termination of parental rights on separate grounds.
In order to establish the absence of an ongoing parent-child relationship, a two-pronged test must be met. Clear and convincing evidence must demonstrate the absence of a relationship "that ordinarily develops as a result of a parent having met on a day to day basis, the physical, emotional, moral and educational needs of the child . . . . " Thereafter, clear and convincing evidence must also demonstrate that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Section 17-112 (b)(4).
The absence of a parent-child relationship can be CT Page 6434 demonstrated in situations where a child has never known his parents so that no relationship ever developed between them, or where the child has lost that relationship so that despite its former existence it has now been completely displaced. In re Juvenile Appeal (Anonymous), 177 Conn. 648,670 (1979). Proof of a lost or displaced relationship depends upon whether a child has specific memories of, or positive feelings for, the natural parents. In re James T., 9 Conn. App. 608, 616 (1987); In re Juvenile Appeal (84-6), 2 Conn. App. 705, 709 (1984), cert. denied,195 Conn. 801 (1985). The existence of some contact between the parent and child does not preclude a finding of no ongoing relationship. In re Juvenile Appeal (Anonymous), 181 Conn. 638,646 (1980).
Clear and convincing evidence has established that Christopher has negative feelings for his mother and that any parent-child relationship has ceased to exist. During the three visitations, which did occur subsequent to the removal of the child, there was little meaningful interaction between the mother and him according to the testimony of Ms. Aurio, the DCYS social worker.
From the time Christopher was committed to DCYS in April, 1988, to the filing of the amended petition, about three years, this mother did not provide for his physical, emotional, moral and educational needs. The child now has expressed a desire to remain with his present foster parents and has become bonded to them. The memories of and feelings for his mother are negative according to Ms. Miller, his present therapist. The Court is entitled to consider the viewpoints of the child in this regard. In re Juvenile Appeal (84-6), supra, 709. As with other adjudicatory decisions, the prediction must be based on facts existing on the filing dates of the amended petition. In re Juvenile Appeal (84-AB), supra, 257.
The facts at trial furnished clear and convincing evidence that any further delay in the hope that a parent-child relationship would develop would be contrary to Christopher's best interest. He has prospered in his last two foster care placements. At the same time, his natural mother has refused to acknowledge, let a lone address, the serious problems which have prevented a meaningful parent-child relationship. Given the background facts, the length of time allowed for change by the parents, and the psychological evaluations, it is clear that any further delay for the development of a parent-child relationship with his mother would be contrary to the best interest of this child. Therefore, the petitioner has proven this second ground by CT Page 6435 clear and convincing evidence.
However, the finding on these two grounds, standing along, is not enough to warrant terminating her parental rights. The Court also must find, by clear and convincing evidence, that termination is in the child's best interest after considering the six factors set forth in Connecticut General Statutes, Sec. 17-112 (d). The Court's findings are as follows:
1. DCYS made several efforts to facilitate the reunion of the mother with her son. Five written agreements or treatment plans were made between August 3, 1987 and March 1, 1989 which concerned Christopher. Pursuant to these agreements, DCYS offered and arranged for a wide range of services to facilitate reunification.
These services included therapy, parent aide, and visitation. DCYS also clearly informed her that she was expected to obtain a stable source of income, obtain suitable housing, and remain in regular contact with the agency. These expectations were communicated to her through all treatment plans.
Sandra S. never followed through with the recommended drug therapy nor did she consistently receive the injections necessary to control her chronic mental illness.
Dr. Colen and Dr. Stern both testified that the respondent-mother's mental health is poor and that her condition is guarded at best. Dr. Colen also testified that he did not believe her capable of caring for a child. "[P]sychological testimony . . . is rightly accorded great weight in termination proceedings." In re Nicolina T., supra, 605; In re Juvenile Appeal (Anonymous), 177 Conn. 648,667.
Barbara Miller, Christopher's therapist, and Dr. Simms testified that this child could not afford to wait any longer for permanency. It is clear that considering Christopher's age and needs, it is unreasonable to allow further time for reunification.
2. The Court ordered evaluations were completed. However, the agency had to make repeated attempts to have the Court ordered psychological evaluation completed. She also failed to appear in court four times on her motions for visitation.
3. There are no positive emotional ties between CT Page 6436 Christopher and his mother. He told his present therapist, Ms. Miller, that he wanted to remain with his foster parents, and does not want to see his mother and feels abandoned by her.
Strong and significant emotional bonds have been developed between Christopher and his foster parents. Ms. Miller testified that Christopher has already waited much too long for permanency. The effect of further delay will increase the likelihood of his inability to attach to an adult foster parent.
4. The child was born on October 16, 1984, and is now more than six and one-half years old.
5. The mother has made minimal and unacceptable efforts to adjust her circumstances, conduct and conditions to have Christopher returned to her in the foreseeable future. With the exception of one period from July, 1985 to January, 1987, when some improvement was noted, there has been little or no improvement by the mother after the child was committed to DCYS in April, 1988 to the time of trial.
She was convicted of drugs and other charges and committed to jail in Niantic three times from April, 1988 through April, 1991.
6. DCYS has not prevented her from maintaining a meaningful relationship with her son, nor was it due to the unreasonable act or conduct or any other person, nor due to economic circumstances. The lack of a meaningful relationship was due to her own conduct and behavior.
After considering all of the facts, the evidence is clear and convincing that termination of parental rights is in the best interest of this child. Christopher deserves the security of family life available to him through adoption.
Therefore, it is ordered that the parental rights of Sandra S., the biological mother, be hereby terminated. Further, in accordance with section 17-112 (1) of the Connecticut General Statutes, it is ordered that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child in adoption, as soon as possible. DCYS is ordered to submit a report in writing to this Court within ninety days of the date of this judgment, and thereafter not less than every six months until such adoption is finalized.
PETRONI, J. CT Page 6437